## Union Bank of Berry, Kentucky, et al. v. National Surety Company of New York.

(Decided June 23, 1922.)

### Appeal from Harrison Circuit Court

1. Insurance—Burglary Insurance.—A policy of burglary insurance held by a bank, and which provides protection for the money and securities locked in the screw door compartment of the safe, and further provides that only ten per cent protection shall be afforded to money and securities of the bank placed in the safe on the outside of the screw door compartment, will protect the bank against loss by burglary to the extent of ten per cent on all money and securities placed in said vault on the outside of the screw door compartment.

2. Insurance—Burglary Insurance.—Where a bank carrying a small amount of burglary insurance desires to keep in its safe a much larger quantity of securities, and decides to take out additional burglary insurance, and in doing so its board of directors at a meeting directs the cashier of the bank, whom it knows to be the agent of the insurance company issuing policies of burglary insurance, to procure for the bank $25,000.00 of such insurance, and the said cashier, under said instructions and while he is regularly engaged as the agent of the insurance company, makes application to the insurance company for a policy of $25,000.00 of burglary insurance covering the safe of the bank, and which policy contains a clause providing that full protection shall be afforded to the bank against loss by burglary of all securities and money deposited inside of the screw door compartment of the safe, but only ten per cent in case said securities or money are left on the outside of the screw door compartment and within the safe, and the attention of said cashier is directly called by the insurance company to said clause in the policy, and with this knowledge the cashier of the bank presents to the board of directors of the bank such burglary insurance policy with said limited liability clause and tells said board of directors, in substance, that the policy is just

what they applied for and is all the protection they need, and the bank thereupon accepts the said policy, it is bound thereby, for the cashier was not only the agent of the insurance company but the agent of the bank as well in the obtention of the said policy of insurance.

M. C. SWINFORD, GORDON & LAURENT for appellants.

DENIS DUNDON and BASKIN & VAUGHN for appellee.

OPINION OF THE COURT BY JUDGE SAMPSON—Affirming.

This appeal presents but one major question: Do certain policies of burglary insurance issued to, or assigned to the Union Bank of Berry, Kentucky, cover and protect said institution against loss by theft of bonds and other securities deposited in the safe of said bank but on the outside of the burglary proof screw door compartments therein? The question arose in this way: The Farmers Deposit Bank and the Deposit Bank of Berry were consolidated in 1919, under the name and style Union Bank of Berry. Before the consolidation each of the banks carried a certain amount of burglary insurance which was, by consent of the insurance companies, assigned to the Union Bank of Berry. At that time, however, the Union Bank had a large number of Liberty bonds and other securities belonging to its patrons deposited in safety boxes in one of the banking institutions of Cincinnati, and desired, on account of the inconvenience of going to Cincinnati to look about the bonds, to bring them to the bank at Berry so that its patrons might have easy access to their bonds. To save the bank harmless in case of burglary or holdup the directors of the institution decided to take out a larger policy of burglary insurance. Some of the members of the board of directors suggested that the amount of the policy be fixed at $50,000.00 or $60,000.00. At that time one Garnet Kemper was cashier of the bank. For about fifteen years before that time he had been and was then the agent of the appellee, National Surety Company, in Berry, for the solicitation of insurance business for that company. The directors of the bank held a meeting, and after discussing the amount of insurance which the bank should take in order to protect its funds as well as the securities, finally agreed upon $25,000.00, and the board instructed Garnet Kemper, its cashier, to obtain for it a policy to the amount of $25,000.00 insuring it against

all loss to the bank through burglary or holdup. Kemper immediately took up the matter with his company and wrote them in detail the kind of policy that was desired; that the bank had a certain character of victor safe of certain dimensions, the nature and character of which was known to the insurance company. After Kemper applied to the insurance company for a policy to protect the securities of the bank, the general agent of the insurance company wrote Kemper in part as follows: "In examining the descriptions of the Victor safe (which the bank had), we do not find whether it has a steel chest or not. If it has then all of the securities would have to be kept in the chest, and if the safe has no chest then the securities would have to be protected by the round or screw door. There is this exception that 10 per cent of the coverage will extend to such securities as may be left out of the chest (if there is one) or outside the round or screw door, if there is no chest. You will get a perfectly clear idea of the exact contract by reading paragraph 10 of Special Agreements on page 2, of the policy." This letter was duly received by Kemper and he answered it on November 20, 1918, in which he stated to the company that "The safe we use is a Victor with jacket, or fireproof arrangement around it with a screw door safe inside. The screw door has a time lock, but is on the inside of this door, while the jacket has a combination lock on it, as well as the screw door. The screw door part of the safe simply sets inside this jacket, which contains partitions overhead and on the sides, and is somewhat of massive construction. . . . We would hardly think paragraph 10 on page 2 would meet this purpose, nor would it be possible to put our safe in the vault. We really need a pretty broad policy to cover this condition, though it probably could be divided into two items, say $7,000.00 on safe and moneys and the remainder on securities." In answer to the foregoing letter the insurance company wrote Kemper: "To help you in making your estimate, the rate per thousand on full coverage, which includes money, etc., is $2.10 per annum. The rate per thousand covering securities only is $1.57½ per annum. If written for a term of three years, the premium will be calculated at three times the annual rate less 10%, and the term premium may be paid in installments of 50, 30 and 20%. . . . Ten per cent coverage allowed under paragraph 10 of the policy would through the two policies cover 20% of your securities and coin and that being 1/5

of the total would be as much as would under any circumstances be left outside the chest.    After deducting your agents commission of 20% the net cost will certainly be lower than it would be possible for you to secure the business through the Kentucky Bankers' Association.''
To which letter Kemper, on November 23rd, replied: ''While I am taking this on myself, I have every reason to believe that I can accomplish what I ask. I want you to send us a policy for $25,000.00 on securities for one year, and if it is not delivered, it will not be my fault.    Our board does not meet until the second Friday in December, but I will have a chance to talk the matter over personally with each before that time.    If necessary, I will allow them my commission to make the policy stick.''

On December 14th, and after the policy had been delivered, Kemper wrote the insurance company: ''I now hand you my check for $39.38, less commission, in payment of burglary insurance policy No. B406499, and pleased to say it went through without the slightest trouble.    We want you to issue us $7,000.00 general burglary policy on January first for one year, and will wish to cancel the $3,500.00 policy wrote for us some months ago, provided it can be done *pro rata.*    Kindly issue policy, if so, and send to us with bill. On January first old policy will be returned to you.''

On November 12, 1911, the insurance company wrote to Kemper: ''The above numbered policy for $25,000.00 covering on securities while contained in a Victor safe, will expire on November 25, 1919.    This policy includes protection against burglary and holdup. . . .    Before writing the new policy please let us know whether the Liberty bonds and other securities are kept in the Victor safe or in another safe.    If in another safe, please give its maker's name and number, so that we may properly identify it.    Upon receipt of this information we will prepare and mail you renewal policy.''

It is the contention of the Berry Bank that the policy of burglary insurance for $25,000.00 issued to the Union Bank of Berry, covered and included not only the money and securities inside of the steel safety box or compartments protected by the screw door, but also all securities within the vault on shelves which surrounded the foregoing screw door safe.    This is denied by the insurance company, which says that the policies protected the bank only to the extent of ten per cent of the value of the

securities left on the outside of the screw door compartment.

On March 26, 1920, while the said policies of insurance were in force the safe of the bank was burglarized and the securities which had been deposited therein by patrons, but left on the outside of the screw door compartment of the safe, amounting to $13,675.00, were stolen. The bank made claim upon the insurance company, under its policy, for the loss of its securities, but was informed by the insurance company that the policy as issued contained a provision limiting its liability to ten per cent of the face of the policy on securities which were outside the screw door compartment.

Whether the liability of the insurance company is confined to ten per cent of the amount of the policy on all securities left on the outside of the screw door of the safe depends, in part, upon the terms of the contract of insurance, and in part upon the question of whether Kemper, who was cashier of the bank and was instructed by its board of directors to obtain for the bank a policy of burglary insurance to the amount of $25,000.00, was the agent of the bank or merely the agent of the insurance company. The policy of insurance, after stipulating that the National Surety Company, as insurer, "Does hereby agree to indemnify the bank for all loss of money and securities from within any safe or vault to which insurance under this policy applies, caused by the felonious abstraction of the same during the day or night by any persons after forcible entry by such person or persons or any accomplice thereof into the safe or vault while duly closed and locked, located in the banking room described in the schedule and hereinafter called the premises, or while located elsewhere after removal from within the premises by thieves, or robbers, or their accomplices, further provides that in the event that the said safe or safes or vault are not locked by time lock, the company shall not be liable for loss of said money and securities feloniously abstracted therefrom, unless said forcible entry is made therein by the use of tools, explosives, chemicals or electricity directly thereupon. . . ." Another provision of the insurance contract: "For all loss by damage to said money and securities, and to said safe or safes or vault, described in said schedule, or to the premises, or to the office furniture and fixtures therein, caused by such persons while making or attempting to make such entry into said premises, vault,

safe or safes. The foregoing general agreements are made subject to the following special agreements, which shall be construed as conditions precedent to any recovery hereunder.''

One of the special agreements referred to is section 10 on the back of the policy, which reads: ''10% and no more of the amount of insurance attaching specifically on contents of any safe containing an inner steel burglar proof chest shall automatically apply, if the safe is burglar proof, on money and securities in said safe outside of its inner chest, and if the safe is fireproof only then said 10% and no more shall apply on securities, silver and subsidiary coin inthe safe outside of its inner chest.''

We are constrained to the view, all the evidence considered, that Kemper was the agent of both the insurance company and the bank in the matter of obtaining the policy of insurance. The bank took the matter up with Kemper before he applied for the policy and engaged him on behalf of the bank to obtain a policy of $25,000.00 for the bank against loss through burglary. The officers of the bank say that they instructed Kemper to obtain the insurance and he did so at their suggestion, and after obtaining the policy he brought it into a meeting of the directors of the bank and told them that the policy was the kind they had applied for and gave them all the protection they sought, and recommended that they accept the policy which was done by the board of directors. The insurance company received the premium. At the same time he was acting as agent for the insurance company with the knowledge of the said insurance company that he was cashier and agent for the bank. The bank knew that Kemper was the agent of the insurance company and had been such for a number of years. Where one party engages an agent, knowing he is the agent of the other party, the agent then becomes the representative of both parties. Bank of Glasgow v. Springfield Ins. Co., 49 Pac. 329; 2nd Corpus Juris pp. 712 and 713. McDoel v. Ohio Improvement & Contract Co. Assignee, 18 K. L. R. 294; R. H. Wilderger v. Hartford Fire Insurance Co., 28 L. R. A. 220; 21 R. C. L. p. 829; 77 Am. Dec. 416.

It seems clear that Kemper was both the agent of the bank and the insurance company for the purpose of obtaining the $25,000.00 policy of burglary insurance. It follows therefore that his acts were the acts of the bank as well as of the insurance company. He had authority

to accept from the insurance company the character of policy which he delivered to the board of directors and which they accepted and approved. The policy by its terms limited the liability of the insurance company for all bonds and securities left on the outside of the screw door safe and stolen, to ten per cent of their actual value. This clause of the contract was included in its terms at the time the policy was delivered to the bank. In fact, the insurance company, through its general manager, called attention to the fact in letters addressed to Kemper that the insurance covered only ten per cent of the value of the securities left on the outside of the screw door safe. There could be and was no misunderstanding about the matter. Kemper as agent of the bank fully understood all the terms and conditions of the policy which he applied for and received for the bank because the terms had been commented upon by the insurance company in letters addressed to him, and he in response to such letters attempted to induce the insurance company to write a policy with a general covering clause that would give the bank full protection, but finding that he could not induce the company to do this he accepted a policy which he well knew limited the protection to bonds and securities outside of the screw door safe to only ten per cent of their value. In accepting the said policy and in inducing the bank to take and accept it, Kemper acted as the agent of the bank as well as the agent of the insurance company. His knowledge of the terms of the contract must be imputed to the bank and its board of directors.

The judgment entered by the lower court is for a sum equal only to that which the insurance company offered to confess, and was not prejudicially erroneous as to appellant. It must therefore be affirmed.

Judgment affirmed.